[No. 32553-5-II. Division Two. August 8, 2006.]

*In the Matter of the Detention of* EDWARD J. FROATS, *Appellant,* THE STATE OF WASHINGTON, *Respondent.*

422

*Amy I. Muth* (of *Ronald D. Ness & Associates*) and *Judith M. Mandel*, for appellant.

*Robert M. McKenna, Attorney General*, and *Melanie Tratnik, Assistant*, for respondent.

¶1 HOUGHTON, J. — Edward Froats appeals a trial court order committing him to the Special Commitment Center as a sexually violent predator. He argues that the State failed to prove a requisite recent overt act.

¶2 Because on the day the State filed the commitment petition Froats was incarcerated for conduct that would itself qualify as a recent overt act and because the trial court correctly found that he committed several recent overt acts during incarceration, we affirm.

## FACTS

¶3 In 1973, Froats abducted two children from a playground at knifepoint and drove them around in his car for an hour or more. The car's interior doors did not have door handles or window handles. Froats told the children, a 7-year-old girl and an 11-year-old boy, that he planned to take them into the woods, remove their clothes, and commit sexual acts with them. The incident ended when Froats stopped at a gas station to allow the girl to use the

toilet and, while Froats waited outside the restroom door, the boy successfully sought help from bystanders.

¶4 In 1974, a jury convicted Froats of second degree kidnapping for this incident and the court imposed a 10-year suspended sentence. The court ordered him to report to a Veterans' Hospital for a mental health evaluation. Instead, he found a camp counselor job.

¶5 At the camp, Froats befriended an 11-year-old boy and sexually molested him. Froats then fled to California where police arrested him and returned him to Washington. Physicians diagnosed him as a psychotic and sexually deviant pedophile. The court committed him to Western State Hospital.

¶6 In 1975, Froats pleaded guilty to indecent exposure and received a 20-year sentence, to be served consecutively to the 10-year kidnapping sentence. In his plea agreement, he admitted only that he swam naked with the 11-year-old boy. But he later admitted that he slept with the boy at least four times, touched his penis, and showed him his erection while the two showered together.

¶7 Froats remained incarcerated until September 1995, when he was paroled to a work release facility. While at the work release facility, he made unwanted sexual advances toward a fellow resident. Over the course of several weeks, he repeatedly approached the resident and invited him to have sex. He exposed himself to the resident and masturbated in the resident's presence. He persisted in this behavior despite the resident's expressing discomfort and a lack of interest. Finally, the resident reported the conduct to a work release supervisor, leading to Froats's parole revocation. The court ordered him to serve the remaining five years of his sentence for indecent exposure.

¶8 On August 5, 2002, a few days before his release, the State filed a petition for an order committing Froats as a sexually violent predator under chapter 71.09 RCW.

¶9 In addition to the events described above, Froats has admitted a number of nonadjudicated sexual offenses

against children. He said that at age 19, he touched the genitals of his infant half-brother and half-sister with his penis. And at age 28, he picked up a 7-year-old girl in his car and performed oral sex on her while she cried. In recounting the incident, he said he had a "beautiful relationship" with her. 3 Report of Proceedings (RP) at 230; Ex. 13A at 122.

¶10 He also described touching the penis of an 11-year-old boy while living in California. He said he approached a young girl on her bicycle and had oral sex with her. He described performing oral sex on a 6-year-old boy in a cemetery in Seattle and performing oral sex on two 5-year-old boys elsewhere in Washington.

¶11 Additionally, he said he picked up a 13-year-old boy, took him to a motel, and had the boy perform oral sex on him. In a hearing before the Indeterminate Sentence Review Board, he admitted victimizing 18 children before his lengthy period of incarceration began in 1975.

¶12 According to the State's expert witness who testified at the commitment proceeding, Dr. Richard Packard, Froats suffers from pedophilia and schizophrenia, which, together, make him more likely than not to reoffend. Froats's pedophilia causes him to suffer from recurrent, intense sexually arousing fantasies, sexual urges, and behavior involving sexual activity with prepubescent children. His schizophrenia creates irresistible urges to act out his distorted and delusional thinking. Additionally, the results of three separate sex offender risk assessment tools indicate that, if released, Froats will more likely than not commit an additional sexually violent offense.

¶13 The State asked Dr. Packard to testify about the incident resulting in Froats's parole revocation. He explained that when a person is unable to express a particular symptom or urge for whatever reason, he often will pick the next closest thing as a substitute. In Dr. Packard's view, Froats's behavior toward his fellow work release resident comprised a form of such symptom substitution. He characterized Froats's conduct as grooming behavior of particu-

lar concern because, at a minimum, Froats violated the work release rules. Dr. Packard explained, "If a person isn't regulated and watching themselves well and allowing to violate these kind of rules, that goes to a reduced sexual self-regulation and that is correlated with people committing new offenses." 3 RP at 295.

¶14 Froats participated in a sex offender treatment program from July 1991 through January 1992. He became sexually aroused during other patients' disclosures and, on at least one occasion, he ejaculated during group therapy.

¶15 Further, when discussing his offenses, Froats persistently characterized his relationship with his child victims as romantic and consensual. After being confronted during sex offender treatment, he became argumentative. Although he acknowledged his pedophilia, he did not express remorse or responsibility for his offenses. Instead, he minimized and rationalized them.

¶16 In April 2000, authorities discovered that Froats had hundreds of pictures of children, apparently cut out from magazines and catalogs. During his deposition taken in the commitment proceedings, he admitted that he sometimes masturbated while looking at the pictures. He acknowledged that having children's pictures created "risk" for him "[b]ecause I have a demon inside of me that says to pick up children and do things to them." Ex. 13A at 112. When asked what kinds of things, he said, "Play with their genitals." Ex. 13A at 112. When asked how he suppresses that demon, he said, "I fight it, I fight it, I fight it constantly." Ex. 13A at 112.

¶17 Also in April 2000, Froats covered over his identification badge photograph with a cut-out picture of two small girls. When asked why he did that, he replied, "Well, because I'm a pervert." 2 RP at 77. He received a major infraction for the incident and spent time in segregation at the McNeil Island Special Commitment Center. Dr. Packard characterized Froats's conduct as "another incident of his failure to intervene and to keep himself removed from the kinds of stimuli that would be problematic for him." 3 RP at

299. He also said that Froats's apparent desire to identify himself as a child is a trait characteristic of pedophiles.

¶18 During an intake interview at the Department of Correction's special offender unit, in May 2001, Froats said that he had been unjustly incarcerated for 25 years despite having "done nothing wrong." 2 RP at 99. He said that "his children were taken from him," and "if you left the children and me alone, they would have been all right and they love me and I love them and there was nothing wrong with that." 2 RP at 100-01.

¶19 In May 2001, Froats made unwanted sexual overtures to a fellow inmate at the sexual offender unit. In response, the inmate assaulted him. The 18- or 19-year-old inmate had a developmental age of about five years. He ranked among the lowest functioning members of the unit. The inmate claimed that Froats touched his head, neck, and shoulders in a sexual manner that made him uncomfortable. When asked about the incident, Froats denied that he had touched the inmate sexually, saying that "[h]e was trying to love him in the way that God loved him." 2 RP at 150-51. Froats used similar language when describing the offenses for which he was incarcerated, involving sexual contact with children.

¶20 Froats received a major infraction for sexual harassment as a result of the incident. Also, counselors placed Froats in administrative segregation because of his inability to control his urges to touch other men.

¶21 Dr. Packard testified that pedophiles commonly have code words to describe their sexual acts with children. He believed Froats's phrase, "loving him like God loved him," is either such a code phrase or an instance of delusional thinking symptomatic of his schizophrenia. 3 RP at 300. Dr. Packard said that Froats's unwanted touching of the developmentally delayed inmate further indicates his unwillingness or inability to avoid the kind of conduct that perpetuates his pedophilic urges.

¶22 In December 2002, while confined at the Special Commitment Center pending adjudication of the State's

sexually violent predator petition, residence counselors discovered pictures of children in Froats's room. One showed a full view of a naked child with his back turned to the camera; one portrayed a mother holding a naked infant, but the mother's picture was cut out; another showed a young boy. The pictures had been cut out of magazines. During his deposition for the commitment proceedings, the State asked Froats why he cut out pictures of naked or seminaked children. He replied, "To gratify my lust for children." Ex. 13A at 110.

¶23 When asked during his deposition whether some of his child victims consented to his sexual contact with them, Froats replied, "Yes." Ex. 13A at 132. He said that a child can consent to sexual contact at the age of 12.

¶24 The State asked Dr. Packard about Froats's possession and display of children's pictures. Dr. Packard said that Froats's possession of the photographs indicates his continued interest in surrounding himself with stimuli that reinforce his pedophilic urges. Froats's apparent unwillingness to avoid such stimuli indicates that he is not "intervening effectively in his cycle" of offending against children. 3 RP at 298. Dr. Packard testified that Froats's possession of the pictures is "another domino [in] the chain of dominos that could lead eventually to new offending if that were to become available." 3 RP at 298.

¶25 In a first amended petition, the State asked the court for a preliminary ruling that it was not required to plead or prove a recent overt act because Froats was incarcerated for a recent overt act (the indecent exposure conviction) on the day the State filed its petition. In the alternative, the State alleged that both the indecent exposure conviction and the conduct resulting in his parole revocation were recent overt acts.

¶26 By amended petitions, the State alleged that Froats committed several additional recent overt acts during incarceration. After a hearing, the trial court ruled that the State need not prove a recent overt act, relying on *In re Detention of Paschke*, 121 Wn. App. 614, 90 P.3d 74 (2004),

*review granted,* 156 Wn.2d 1030, 131 P.3d 905 (2006), as controlling authority.

¶27 The trial court found that the kidnapping offense was sexually motivated and therefore constituted a sexually violent offense under RCW 71.09.020(15)(c). It also found that Froats currently suffers from pedophilia, sexually attracted to both sexes, nonexclusive type, and schizophrenia, paranoid type, episodic with interepisode residual symptoms. It further found that Froats would more likely than not engage in predatory acts of sexual violence unless confined to a secure facility.

¶28 The trial court also entered an alternative additional finding that the following acts constituted distinct recent overt acts: Froats's unwanted touching of another inmate during incarceration, taping a child's picture over his identification badge, posting pictures of children on his bulletin board, and keeping photographs of children in his room at the Special Commitment Center.

¶29 In supplemental conclusions of law, the trial court also found that Froats's unwanted sexual advances toward his fellow resident at the work release facility in 1995 and 1996 was a recent overt act, but that the 1975 indecent exposure conviction was not a recent overt act.

¶30 The trial court determined that Froats was a sexually violent predator and ordered him confined to the Special Commitment Center. Froats appeals.

## ANALYSIS

¶31 Froats first argues that the trial court erred in ruling that the State need not prove a recent overt act. He contends that due process requires that the State plead and prove a recent overt act because, at the time the State filed its petition, he was incarcerated for indecent exposure, a crime that was neither a sexually violent offense nor a recent overt act.

¶32 To obtain an order of civil confinement, the State must prove beyond a reasonable doubt that the person

meets the statutory definition of a sexually violent predator. RCW 71.09.060. A sexually violent predator is "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(16). The required link between mental illness and the likelihood of future criminal conduct satisfies the constitutional requirement that a person subject to civil confinement has a proven lack of control over his behavior. *In re Det. of Thorell*, 149 Wn.2d 724, 735-36, 72 P.3d 708 (2003) (construing *Kansas v. Crane*, 534 U.S. 407, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002)).

¶33 But the State bears the extra burden of alleging and proving a recent overt act in some circumstances. The State must prove a recent overt act when the offender was free from total confinement at the time the State filed its petition. RCW 71.09.060(1); *In re Pers. Restraint of Young*, 122 Wn.2d 1, 42, 857 P.2d 989 (1993). This extra burden also arises when an individual has been living free in the community and is later incarcerated for conduct that does not constitute either a sexually violent offense or a recent overt act. *In re Det. of Albrecht*, 147 Wn.2d 1, 11 n.11, 51 P.3d 73 (2002); *In re Det. of Henrickson*, 140 Wn.2d 686, 689, 2 P.3d 473 (2000).

¶34 For example, in *Albrecht* the State filed a petition when Albrecht was in jail for violating the conditions of his community placement. The State did not allege that the community custody violation would qualify as a recent overt act, arguing that the mere fact of Albrecht's incarceration eliminates the necessity of proving a recent overt act. *Albrecht*, 147 Wn.2d at 6. Our Supreme Court disagreed, noting that a community custody violator may be incarcerated for offenses that do not necessarily establish current dangerousness, such as "consuming alcohol, going to a park, or moving without permission." *Albrecht*, 147 Wn.2d at 11. The danger exists that the State could seize on an

offender's incarceration for a relatively innocuous offense to avoid the recent overt act requirement. Thus, the State must either establish that the offender was incarcerated for conduct that would qualify as a recent overt act or allege and prove a recent overt act at trial.

¶35 As a threshold question, the court, not a jury, must decide whether an offender was incarcerated for conduct that would qualify as a recent overt act. *In re Det. of Marshall*, 156 Wn.2d 150, 158, 125 P.3d 111 (2005).

## *Paschke*

¶36 Here, Froats was incarcerated on the day that the State filed its petition. Whether the State had to prove a recent overt act depends on whether he was incarcerated for either a sexually violent offense or conduct that qualifies as a recent overt act. Relying on *Paschke*, the trial court ruled that the State need not prove a recent overt act. 121 Wn. App. 614.

¶37 In *Paschke*, Division Three held that the State need not prove a recent overt act for an incarcerated person whose parole had been revoked five years earlier. While serving his sentence for a sexually violent offense, Paschke was paroled from prison for 18 months. His parole was revoked after he made obscene telephone calls that he characterized as a "relapse" of sexual deviance. *Paschke*, 121 Wn. App. at 616. Distinguishing *Albrecht,* the *Paschke* court determined that the State could not circumvent the recent overt requirement because, unlike Albrecht's short-term incarceration for a community placement violation, Paschke spent several years in prison before the State filed its petition.

¶38 The *Paschke* court further reasoned that events that occurred several years previously could not be "recent," so it would be absurd to require the State to prove a recent overt act, just as it would be absurd to require such proof for a currently incarcerated individual. 121 Wn. App. at 623. Finally, the court concluded that "the sole reasonable infer-

ence" from the record was that Paschke's reincarceration resulted from a recent overt act, as evidenced by the victims' testimony as well as his own admission that the obscene telephone calls were a "relapse." *Paschke*, 121 Wn. App. at 623.

¶39 Here, the State persuaded the trial court to accept *Paschke* as controlling authority. Accordingly, it ruled that the State need not prove that Froats committed a recent overt act during his work release, noting that "the State is not required to prove the commission of a Recent Overt Act if the individual was confined for a substantial period of time between the individual's reincarceration and the filing of the Sexually Violent Predator petition." 4 Clerk's Papers at 676. *Paschke* reached the correct result but we cannot agree with its reasoning.[1]

¶40 In *Marshall*, our Supreme Court held that whether an individual is currently incarcerated for a recent overt act comprises a mixed question of fact and law for the trial court to decide, not the jury. 156 Wn.2d at 158. In so holding, the *Marshall* court specifically approved *State v. McNutt*, 124 Wn. App. 344, 101 P.3d 422 (2004) (trial court properly concluded that offense of communicating with a minor for immoral purposes was a recent overt act, although it is not a per se sexually violent offense), *review denied*, 156 Wn.2d 1017 (2006). *Marshall*, 156 Wn.2d at 158.

■ ■ ¶41 In light of *Marshall*, it appears that the *Paschke* court incorrectly reasoned that the State would be unable to establish that an individual was incarcerated for a recent overt act when a substantial period of time has passed following parole revocation. In determining whether a person was incarcerated for a recent overt act, the relevant time frame is the time of reincarceration, not the filing of the petition. As *McNutt* and *Marshall* show, this

---

[1] We also note that on April 6, 2006, our Supreme Court accepted review and remanded *Paschke* for reconsideration in light of *Marshall*, 156 Wn.2d 150. *Paschke*, 156 Wn.2d 1030.

involves the trial court's retrospective examination of the conduct that resulted in reincarceration.

¶42 We disagree with the *Paschke* court's reasoning that an event five years in the past cannot be "recent," thus making a showing of a recent overt act requirement an impossible burden. Instead, we ask whether the offender was incarcerated for an act that "would have" constituted a recent overt act when committed. *Henrickson*, 140 Wn.2d at 689. In Paschke's case, "the sole reasonable inference" from the record was that his parole was revoked for an act that would constitute a recent overt act, i.e., making obscene telephone calls. Thus, because Paschke was incarcerated for a recent overt act on the date the State filed its petition, the State need not have proved a recent overt act.

¶43 The *Paschke* court's reasoning that *Albrecht* does not apply when a person has been reincarcerated for several years following parole revocation, rather than for a short period of time following violation of community custody, appears faulty. The *Albrecht* court was concerned that the State may seize on the opportunity to avoid proof of a recent overt act by filing a petition when an individual is incarcerated for a relatively innocuous offense after violating a condition of release. 147 Wn.2d at 11. The *Paschke* court reasoned that no such concern exists when the State files a petition after a lengthy period of reincarceration, an apparently inapplicable distinction. 121 Wn. App. at 623-24.

¶44 Conditions of parole, like conditions of community supervision, may include a host of requirements where violations do not necessarily rise to the level of a recent overt act. Some of the conditions of Froats's parole, for instance, required him to obey all court orders, comply with all rules and regulations in the work release program, successfully complete 120 days in the work release program, abstain from alcohol, take his medications, and undergo mental health counseling. The *Albrecht* court's concern that the State could be relieved of its burden of proving a recent overt act following incarceration for a

relatively innocuous offense applies as well in the parole context as in the community custody context. And that concern persists whether the offender is reincarcerated for 60 days or five years.

¶45 The passage of time since reincarceration is not relevant in deciding whether a person was incarcerated for either a sexually violent offense or a recent overt act. The word "recent" in this context is relative to the moment of incarceration, not the filing of the petition.

¶46 Here, the trial court incorrectly applied *Paschke* when it ruled that the State need not prove a recent overt act.[2] Nevertheless, we may affirm the trial court on any other ground the record supports. *State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004). At the State's request, the trial court found that the conduct resulting in Froats's parole revocation was a recent overt act. This finding supports the trial court's ruling.[3]

---

[2] When the trial court applied *Paschke* here, our Supreme Court had not yet taken review or remanded the case for reconsideration in light of *Marshall*.

[3] Froats argues that the relevant focus is the indecent exposure conviction, not the conduct resulting in his parole revocation. In his view, because the indecent exposure conviction was not a sexually violent offense and the trial court specifically found that it was not a recent overt act, he was incarcerated for neither a sexually violent offense nor a recent overt act when the State filed its petition. The State agrees that the indecent exposure conviction is the relevant focus, but it counters that the trial court erred in finding that it was not a recent overt act.

In the community custody context, incarceration for violations of community custody conditions is not incarceration for the underlying offense for purposes of the recent overt act analysis. *See In re Det. of Broten*, 115 Wn. App. 252, 256, 62 P.3d 514 (2003); *In re Det. of Davis*, 109 Wn. App. 734, 746, 37 P.3d 325 (2002). Thus, we ask whether the community custody violation, not the underlying offense, would qualify as a recent overt act. The State argues, and Division One recently agreed, *see In re Detention of Hovinga*, 132 Wn. App. 16, 22-23, 130 P.3d 830 (2006), that the relevant focus in parole cases is the underlying offense, not the conduct resulting in parole revocation, based on substantive differences between parole and community custody. We decline to decide whether those whose parole has been revoked are subject to a different analysis than community custody violators in determining whether the State must prove a recent overt act. On these facts, we see no need to reach back 30 years to the indecent exposure conviction where the State has proved that the relatively recent conduct resulting in Froats's parole revocation would qualify as a recent overt act.

Recent Overt Act at Work Release Facility

¶47 Froats argues that the incident at the work release facility could not be a recent overt act because it happened six years earlier and, thus, was not "recent." In support, Froats relies on *Paschke*, which dispensed with the recent overt act requirement as impossible to meet where an offender has been reincarcerated for several years following parole revocation. 121 Wn. App. at 623.

¶48 As already discussed, we disagree with the *Paschke* court's analysis on the recent overt act requirement because the question, for purposes of determining whether the State is required to prove a recent overt act at trial, is whether a person is incarcerated for conduct that would have qualified as a recent overt act at the time of incarceration. *See Henrickson*, 140 Wn.2d at 689 (due process does not require proof of a recent overt act when an individual is incarcerated for "an act that by itself *would have qualified* as a recent overt act" (emphasis added)).

¶49 Alternately, Froats contends the incident resulting in his parole revocation does not rise to the level of a recent overt act because no one familiar with his offense history would conclude that his behavior was dangerous. In his view, the evidence was insufficient because the work release resident does not fit his victim profile (children), and his behavior is best viewed as the attempt of a homosexual male to enter into consensual sexual relations with another adult male.

¶50 A recent overt act is "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." RCW 71-.09.020(10). Whether a person is incarcerated for a recent overt act is a mixed question of law and fact for the court, not the jury. *Marshall*, 156 Wn.2d at 158. The court must first inquire into the factual circumstances of a person's history and mental condition; then the court must make the

legal determination whether an objective person knowing those factual circumstances would have a reasonable apprehension of harm of a sexually violent nature resulting from the act in question. *Marshall*, 156 Wn.2d at 158; *McNutt*, 124 Wn. App. at 350-51. Even in the absence of a trial court's factual analysis, we may make this determination for the first time on appeal. *McNutt*, 124 Wn. App. at 350-51 (approved in *Marshall*, 156 Wn.2d at 158).

¶51 Froats urges us to apply a standard of reasonable apprehension of harm from the common law governing assault. Neither the statute nor case law supports his argument that a recent overt act must cause reasonable apprehension of harm in the intended victim. On the contrary, the question is whether an objective person familiar with the person's mental health and offense history would reasonably fear harm. The act or threat itself need not be dangerous. *See In re Det. of Hovinga*, 132 Wn. App. 16, 130 P.3d 830 (2006) (act of masturbating while covertly following girls around a store); *In re Det. of Broten*, 130 Wn. App. 326, 122 P.3d 942 (2005) (act of being in a park at a children's playground without a chaperone); *In re Det. of Albrecht*, 129 Wn. App. 243, 252, 118 P.3d 909 (2005) (act of luring a young boy with 50 cents), *review denied*, 157 Wn.2d 1003 (2006).

¶52 Froats argues that a broad interpretation of recent overt act offends constitutional principles, including substantive due process and the vagueness doctrine. We disagree.

¶53 In Albrecht's appeal after remand, Division Three rejected a similar argument, noting that the recent overt act requirement is but one part of the showing the State must make in proof of a person's status as a sexually violent predator. *Albrecht*, 129 Wn. App. at 256-57. The recent overt act requirement was added to the existing statutory scheme to ensure an extra layer of proof in support of a finding of current dangerousness. *Albrecht*, 129 Wn. App. at 252. In addition to a recent overt act, the State must prove that an individual suffers from a mental abnormality that

makes it likely the person will engage in predatory acts of sexual violence if not confined to a secure facility. This requirement satisfies due process. *See Thorell*, 149 Wn.2d at 735-36.

¶54 Froats asserts that insufficient evidence supports the trial court's finding because the inmate did not feel personally threatened by the conduct and felt free to walk away. But the test is whether Froats's behavior would instill reasonable apprehension in an objective person aware of his history and condition.

¶55 Here, the State need not prove that the inmate had a reasonable apprehension of fear. The State's expert witness testified that Froats's conduct toward the inmate was a form of symptom substitution, in which he acted out his pedophilic urges on an adult in the absence of his preferred object, a child. In Dr. Packard's view, that Froats engaged in this conduct, knowing it violated conditions of release, indicates his continued inability to control his pedophilic urges, making it likely that he would reoffend.

¶56 In light of Froats's offense history, his diagnosed pedophilia, and his lack of remorse or insight about his offenses against children, his conduct creates a reasonable apprehension in the mind of an objective person familiar with his mental condition and offense history that he is likely to commit future harm of a sexually violent nature. Sufficient evidence supports the trial court's finding that Froats committed a recent overt act at the work release facility.

¶57 The court properly ruled that the State need not prove a recent overt act because Froats was incarcerated for what would constitute a recent overt act on the day the State filed its petition.

Recent Overt Acts During Incarceration

¶58 Even assuming the State was required to prove a recent overt act, the record shows that it met that burden in this case.

¶59 Froats contends the trial court erred in entering supplemental findings that he committed several recent overt acts during incarceration. The acts in question include his sexual harassment of a developmentally-delayed fellow inmate, pasting a photograph of two young girls over his identification badge photograph, cutting out and displaying hundreds of pictures of children, and possessing nude photographs of children. In Froats's view, the recent overt act requirement relates only to the period of an offender's release into the community and cannot be satisfied by evidence of acts occurring during incarceration. Alternately, Froats argues that insufficient evidence supports the findings because the incidents do not give rise to a reasonable apprehension of harm.

¶60 We discern no persuasive logical or practical reason to limit evidence of a recent overt act to preincarceration conduct when the individual is incarcerated on the day of filing. Given that the purpose of the recent overt act requirement is to ensure sufficient evidence of *current* dangerousness, it would be absurd to limit the evidence to earlier periods of release. Evidence of an offender's conduct during incarceration is likely to be more relevant and probative of current dangerousness than conduct that occurred during an earlier period of release.

¶61 Citing *Young*, Froats argues that if we permit the State to prove a recent overt act based on conduct during incarceration, then obviously it is not an impossible burden to meet, and the State should be required to prove a recent overt act regardless of whether a person is incarcerated. Froats's argument does not persuade us.

¶62 In *Young*, our Supreme Court held that the State need not prove that an incarcerated individual committed a recent overt act because requiring it to do so would create a standard that is "impossible to meet" and thus "absurd." 122 Wn.2d at 41. Given that confinement severely restricts the opportunities to engage in criminal conduct, the absence of a recent overt act in an institutional setting does not necessarily negate the offender's dangerousness. In

such cases, the State may rely instead on the offender's offense history, mental condition, expert testimony, and other relevant, probative evidence to establish the offender's current dangerousness. *See In re Det. of Pugh*, 68 Wn. App. 687, 696, 845 P.2d 1034 (1993). The absence of proof of a recent overt act does not necessarily offend due process because a determination of current dangerousness inheres in the finding that a person is a sexually violent predator. *Young*, 122 Wn.2d at 32.

¶63 The point of *Young* is that an individual's conduct during incarceration is not necessarily probative of current dangerousness given the relative difficulty, if not impossibility, of committing an offense during incarceration. Thus, the *lack* of a recent overt act does not negate a finding of current dangerousness as evidenced by other relevant, probative evidence. But if an individual commits a recent overt act, notwithstanding the restrictive conditions of confinement, the State may present it as evidence of current dangerousness.

¶64 The trial court did not err in finding that Froats's unwanted touching of a developmentally-delayed inmate was a recent overt act. Although the inmate was an adult, not a child, he had a developmental age of five. Froats's conduct was consistent with his diagnosed pedophilia and long history of sexual offenses against children. In discussing the incident, Froats used the same words that he uses when discussing his prior sexual offenses against children. A reasonable person familiar with Froats's history and mental condition could conclude, as the State's expert did, that Froats's conduct was a form of symptom substitution that portends future harm of a sexually violent nature if he were released from confinement.

¶65 The trial court did not err in finding that Froats's taping a picture of two young girls over his identification badge photograph was a recent overt act. He admitted that his pedophilia motivated him to do this. The State's expert testified that the incident reveals Froats's

current emotional identification with children, a pedophilic trait characteristic indicating his continued pathological preoccupation with children. Again, a reasonable person could conclude that Froats's pedophilic urges persist, creating a reasonable apprehension of future harm of a sexually violent nature.

 ¶66 Finally, the trial court did not err in finding that Froats's possession and display of hundreds of photographs of children, including some nude photographs, was a recent overt act. He admitted that he masturbates to pictures of children and that he cuts out such pictures to gratify his lust for children. He acknowledges that he should avoid contact with such pictures because they are risky for him, as they activate his irresistible pedophilic urges. As the State's expert testified, his possession of the photographs evidences his current preoccupation with children and his unwillingness or inability to regulate his behavior in a manner that would reduce the risk of reoffending. A reasonable person could reasonably fear that Froats's possession of such photographs indicates that he is a recalcitrant pedophile, more likely than not to commit harm of a sexually violent nature.

¶67 Affirmed.

BRIDGEWATER and PENOYAR, JJ., concur.

Review denied at 160 Wn.2d 1022 (2007).