211 P.3d 994 (2009)
In re the Matter of the DETENTION OF John Charles ANDERSON, Petitioner.
No. 79111-2.
Supreme Court of Washington, En Banc.
Argued January 15, 2008.
Decided July 9, 2009.
Donald Boyette Lundahl, Attorney at Law, Antioch, CA, for Petitioner.
Sarah Sappington, Attorney General's Office, Seattle, WA, for Respondent.
King County Prosecutor's Office, David J.W. Hackett, Seattle, WA, Amicus Curiae on behalf of Washington State Association of Prosecuting Attorneys.
J.M. JOHNSON, J.
¶ 1 John Anderson is a convicted child rapist and, for the past decade, a mental patient institutionalized at Western State Hospital (WSH). At WSH he engaged in numerous sexual liaisons with vulnerable and developmentally disabled copatients. When he sought release, the State petitioned to commit him as a sexually violent predator under chapter 71.09 RCW.
¶ 2 The trial court appointed and funded an expert to assist in his defense, but *995 Anderson ultimately decided not to call that expert at trial. Before trial, Anderson asked the court for the appointment of a different expert, Dr. Richard Wollert, but the trial judge denied his request. At the conclusion of Anderson's trial, the trial court found that Anderson's sexual activities at the hospital were recent overt acts, found him to meet the sexually violent predator (SVP) definition, former RCW 71.09.020(16) (2006), recodified as RCW 71.09.020(18), and ordered his commitment. The Court of Appeals affirmed the holding of the trial court on a recent overt act but reversed and remanded for a new trial holding that the trial court erred in refusing to appoint the requested testifying expert for Anderson. In re Det. of Anderson, 134 Wash.App. 309, 139 P.3d 396 (2006).
¶ 3 Anderson now claims that the trial court erred in finding recent overt acts and in denying him another expert for trial. Anderson petitioned for discretionary review, and the State cross-petitioned, arguing the State's obligation is satisfied by providing the first expert. We granted review on both issues. In re Det. of Anderson, 160 Wash.2d 1005, 158 P.3d 614 (2007).
¶ 4 This court affirms the Court of Appeals' decision to remand for a new trial at which Anderson may call Dr. Wollert, or another expert witness, to perform an evaluation and testify at trial. Whether or not Anderson's conduct amounted to a recent overt act, according to former RCW 71.09.020(10) (2006), recodified as RCW 71.09.020(12) will also be determined on remand but the acts as found do satisfy that requirement.

FACTS AND PROCEDURAL HISTORY
¶ 5 When John Anderson was 13, he lured a 5-year-old girl and exposed himself. At 15, he anally raped a 2-year-old boy and a boy 2 years his junior. When Anderson was 17, he pleaded guilty to statutory rape in the first degree of a 2 1/2-year-old boy. For this crime, Anderson was sentenced to a juvenile rehabilitation center. While serving his time at the juvenile center, he sexually abused his roommate. A year later, Anderson exposed himself to a female staff member and was convicted of public indecency.
¶ 6 Prior to Anderson's release, the State filed a petition to involuntarily commit him as an SVP.[1] Rather than contest the petition, Anderson admitted himself to WSH for treatment of sexual sadism and pedophilia.
¶ 7 While at WSH, Anderson had sexual relationships with eight patients, including four men.[2] The record indicates that Anderson intentionally took advantage of his sexual partners. Three of Anderson's relationships were with mildly to moderate retarded patients, while Anderson's IQ (intelligence quotient) is between 128 and 130. A fourth patient had a childhood history of severe sexual abuse and a serious personality disorder. The trial court found that Anderson "engaged in sexual contact with at least four vulnerable patients . . . all of whom he knew to be developmentally delayed, psychiatrically impaired, or both." Clerk's Papers (CP) at 187.
¶ 8 Anderson himself described these relationships as "deviant," and he admitted that he took sexual advantage of at least two patients because they were disabled. 2 Verbatim Report of Proceedings at 120. Anderson's treatment professional at WSH *996 testified that at least three of the patients with whom Anderson had sex were incapable of consensual sex. Anderson was repeatedly told by WSH staff to end these relationships, but he ignored this instruction.[3] Anderson engaged in the last of the reported sexual encounters just two months before the State filed this action.
¶ 9 After a decade in the hospital, Anderson sought to leave. The State and every expert who examined Anderson concluded that he was not safe to be at large, and the State petitioned to commit him as an SVP. While Anderson awaited trial, he was confined at the Special Commitment Center on McNeil Island.
¶ 10 Initially, the court appointed an expert for Anderson, Dr. Brian Judd, at state expense; however he ultimately decided not to use Dr. Judd at trial. Two years before trial, Anderson informed the State that he wished to consult with another expert, Dr. Richard Wollert. One week prior to trial, Anderson requested that the court appoint Dr. Wollert to testify on Anderson's behalf. Anderson agreed to waive his trial date to accommodate the State's need to interview Dr. Wollert prior to testimony. The State objected, and the trial court denied Anderson's request for appointment of this expert.
¶ 11 At trial, one of the State's experts, Dr. Amy Phenix, testified that Anderson's sexual relations with vulnerable copatients proved he was still dangerous because Anderson substituted vulnerable patients for his preferred child victims. Based on the expert testimony and documentary evidence, the trial court found that Anderson is a sexual sadist, a pedophiliac, and has a personality disorder.[4] The trial court found that Anderson "is likely to engage in predatory acts of sexual violence if not confined in a secure facility." CP at 187. The court concluded as a matter of law that Anderson's sexual conduct toward vulnerable patients at WSH constituted a recent overt act, a prerequisite to Anderson's commitment.[5]Id. at 189. The trial court also held, after considering the experts, that Anderson was a sexually violent predator likely to engage in predatory acts if not confined. Id. Accordingly, the trial court ordered Anderson's commitment.
¶ 12 Anderson appealed, arguing that the State failed to prove a recent overt act. Anderson also claimed the trial court abused its discretion by denying his request for appointment of another expert for trial. The Court of Appeals suggested that the State had met its burden of proving a recent overt act, but it also held that the trial court had abused its discretion in denying Anderson's request for a new expert and remanded for a new trial. Both parties sought review.

STANDARD OF REVIEW
¶ 13 We review de novo whether Anderson's acts were recent and overt. In re Det. of Marshall, 156 Wash.2d 150, 158, 125 P.3d 111 (2005). We review a trial court's decision to admit expert testimony for abuse of discretion. In re Pers. Restraint of Young, 122 Wash.2d 1, 57, 857 P.2d 989 (1993). Abuse of discretion occurs when the trial court acts on unreasonable or untenable grounds. Indus. Indem. Co. of Nw., Inc. v. Kallevig, 114 Wash.2d 907, 926, 792 P.2d 520 (1990).

ANALYSIS

I. Recent and Overt Act

¶ 14 Under the SVP law, to commit a nonincarcerated person, the State must prove a recent overt act, defined as any act or threat creating a reasonable apprehension of sexually violent harm in the mind of an objective person who knows the person's history *997 and mental condition. Former RCW 71.09.030(5) (2008); former RCW 71.09.020(10). Anderson claims that his acts are neither recent nor overt. The State agrees it must establish this element beyond a reasonable doubt. Because Anderson does not challenge the trial court's findings of fact in this regard, we treat those findings as true. In re Estate of Jones, 152 Wash.2d 1, 8, 93 P.3d 147 (2004). Note, however, that Anderson will receive a new trial, at which he may challenge all findings.
¶ 15 Anderson's sexual activities at WSH could constitute overt acts. Dr. Phenix testified, and the trial court found, that Anderson engaged in sexual activity with vulnerable patients as substitutes for his preferred victims, children.[6] As the Court of Appeals noted, Anderson's acts of exploiting vulnerable adults were closely akin to his assaults on children. Anderson also had ongoing sexual fantasies of children involving sexual violence. Dr. Phenix and other specialists who were familiar with Anderson's history and mental condition concluded in light of these factors that he posed a clear risk to reoffend if released from custody. Those expert opinions support a reasonable apprehension of sexually violent harm, and therefore by definition, Anderson's sexual activities could constitute overt acts. See former RCW 71.09.020(10).
¶ 16 Anderson's overt acts were recent. This court has held in the SVP context that overt acts occurring up to five years before the petition's filing may be "recent." In Marshall, the defendant committed the act in November 1995, and the State brought the petition in November 2000. Marshall, 156 Wash.2d at 153, 125 P.3d 111. We held it to be a recent overt act. Id. at 159, 125 P.3d 111. In In re Detention of Henrickson, 140 Wash.2d 686, 2 P.3d 473 (2000), one of the defendants committed his act in 1996, and the State filed the petition in 1999. Id. at 691, 2 P.3d 473. We held that this act was sufficiently recent. Id. at 696, 2 P.3d 473. Here, only two months before the State filed this petition, Anderson was reported having sex with a vulnerable copatient, the most recent reported act in a long string of such acts. The trial court correctly concluded that Anderson's acts two months before filing were recent, consistent with the law and prior decisions of this court.

II. It Was Abuse of Discretion To Fail To Appoint a Trial Expert

¶ 17 The trial court may appoint additional experts at State expense for good cause. See former WAC 388-885-010(3)(c) (1999), recodified as WAC 388-885-013(2). The Court of Appeals correctly determined that Anderson should have been permitted to engage an expert (Dr. Richard Wollert) to perform a forensic psychosexual evaluation and to testify as an expert witness at trial. Anderson, 134 Wash.App. at 321-22, 139 P.3d 396. We agree with the Court of Appeals that Anderson's motion to call Dr. Wollert as an expert should be granted. A sufficient showing was made that Dr. Wollert would provide distinctly meaningful expert testimony in Anderson's defense. Dr. Wollert would have challenged Dr. Phenix's conclusion that Anderson is likely to commit predatory acts of sexual violence if not confined in a secure facility.[7] Anderson additionally cites Dr. Wollert's availability, the early notice that he was a possible expert witness, and difficulty in engaging another doctor as good cause for the appointment.
¶ 18 No significant countervailing interests undermined Anderson's request. As the Court of Appeals observed, any additional delay would not be in Anderson's best interest because he was confined. The State would not have been unduly prejudiced as a result of any delay. Dr. Wollert offered to be available to the State for discovery at any *998 time. Anderson was also willing to waive his trial date to accommodate the State's need to interview Dr. Wollert prior to his testimony. Under these circumstances, we agree with the Court of Appeals that there was good cause to appoint Dr. Wollert as an additional expert witness at public expense under former WAC 388-885-010(3)(c).
¶ 19 We recognize that among the exceptional protections provided by the legislature for SVP trials,[8] multiple experts at state expense are not included. Thus, our holding should not be read as an open-ended entitlement for indigent SVP respondents to an unlimited number of experts at state expense. Under the specific circumstances of this case, however, the trial court acted on unreasonable grounds in denying the motion and, therefore, abused its discretion.

CONCLUSION
¶ 20 We remand for a new trial so that Dr. Wollert, or another appropriate expert witness, may perform an evaluation of Anderson and testify on his behalf. Whether or not Anderson's conduct amounted to a recent overt act, as with the other elements of the State's case, will have to be proved at that new trial.
WE CONCUR: ALEXANDER, C.J., C. JOHNSON, MADSEN, and OWENS, JJ.
SANDERS, J. (dissenting).
¶ 21 I agree with our majority and the Court of Appeals that the trial court abused its discretion when it refused to appoint Dr. Richard Wollert as John Anderson's expert witness and thus denied Anderson the services of a trial expert to rebut the State's evidence. I disagree, however, that the acts relied upon by the State could constitute recent overt acts. Therefore I would reverse and dismiss.

I. Facts and Procedural History
¶ 22 In 1988 Anderson pleaded guilty to first degree statutory rape of a two-and-a-half-year-old boy. Anderson was 17 years old. He was sentenced to a juvenile rehabilitation center.
¶ 23 In 1990 after serving his time at the juvenile rehabilitation center, Anderson voluntarily committed himself to Western State Hospital (WSH) for treatment of sexual sadism and pedophilia.[1] He remained at WSH until the State filed its commitment petition in 2000.
¶ 24 During his 10-year residence at WSH, Anderson engaged in consensual homosexual relationships with four adult male patients: Darryl, Curtis, Bobby, and Rory.[2] Darryl, Curtis, and Bobby were diagnosed mildly or moderately retarded. Rory was of average intelligence.[3] Anderson's relationship with Darryl, Curtis, and Bobby took place between 1991 and 1996. Anderson's relationship with Rory ended in late 1999.
¶ 25 As part of group therapy Anderson and his partners spoke about these relationships, ending them when counseled to do so, albeit not immediately.[4] Anderson admitted he took advantage of Darryl, Curtis, and Bobby but not Rory.
¶ 26 Neither Darryl, Curtis, Bobby, nor Rory requested any action against Anderson *999 even though encouraged to do so if they felt victimized. At no time did the staff at WSH pursue charges against Anderson even though the possibility was investigated. Dr. Larry Arnholt testified there was no "coercive or forceful aspects to any of these sexual relationships." Clerk's Papers (CP) at 181. Sexual relationships between patients are against WSH rules but are not uncommon. WSH makes condoms available.
¶ 27 As a voluntary patient Anderson could leave WSH with or without permission. Anderson would regularly take permissive leave up to four times a month generally to visit his mother for a couple days. At least twice during his 10-year residence, Anderson left without permission. During one of his nonpermissive leaves, he admitted to consuming alcohol; during the other he helped a friend find an apartment. Nothing in the record suggests Anderson engaged in sexually violent activity during any of his time away from WSH.
¶ 28 During his time at WSH Anderson underwent various treatments, therapies, and evaluations wherein he admitted to numerous sexually violent offenses as a juvenile and to sexually violent fantasies. According to Anderson's last assessment, he can now control his sexual arousal.
¶ 29 On February 20, 2000, Anderson informed WSH staff he intended to leave WSH permanently. On February 25, 2000,[5] the State filed a commitment petition alleging Anderson was a sexually violent predator[6] and his homosexual relationships, among other conduct, constituted recent overt acts.
¶ 30 Anderson moved for judgment on the pleadings, arguing insufficient allegations to support the State's claim that he is a sexually violent predator or that he committed a recent overt act. The trial court denied Anderson's motion to dismiss and then tried him, pursuant to chapter 71.09 RCW, to determine whether Anderson should be civilly committed. The trial court found Anderson's homosexual relations with Darryl, Curtis, Bobby, and Rory were substitutes for his preferred victims. The trial court concluded Anderson was a sexually violent predator, and these homosexual relations constituted recent overt acts. The Court of Appeals affirmed. In re Det. of Anderson, 134 Wash. App. 309, 323-24, 139 P.3d 396 (2006). However, the Court of Appeals remanded for a new trial because the trial court refused to permit "Anderson to engage an appropriate expert witness." Id. at 322, 139 P.3d 396.

II. Standard of Review
¶ 31 Whether an act is both recent and overt is a mixed question of law and fact.[7]In re Det. of Marshall, 156 Wash.2d 150, 158, 125 P.3d 111 (2005). To resolve a mixed question of law and fact we apply legal principles to factual circumstances. Erwin v. Cotter Health Ctrs., 161 Wash.2d 676, 687, 167 P.3d 1112 (2007). Unchallenged factual findings are verities on appeal; however, the application of applicable law to those facts is a question of law reviewed de novo. Id.
¶ 32 The facts here are unchallenged. Anderson admits he was convicted of a sexually violent offense, suffers from a mental abnormality, and engaged in sexual relations while a patient at WSH. The State concedes it must prove Anderson committed a recent *1000 overt act. Anderson, 134 Wash.App. at 323, 139 P.3d 396. Therefore, all that remains is the "legal inquiry" into whether Anderson's consensual homosexual relationships, as well as other conduct, are recent overt acts. Marshall, 156 Wash.2d at 158, 125 P.3d 111.
¶ 33 The issue should be framed as one of consensual homosexual relations for two reasons. First, the State does not allege Anderson's heterosexual relationships were recent overt acts. Second, Washington law does not presume an individual is incapable of consenting to sex due to an intellectual disability.[8] As such the issue is whether Anderson committed a recent overt act by engaging in consensual homosexual conduct with four adult patients at WSH, among other conduct, while a voluntary patient as WSH.

III. Analysis
¶ 34 In re Detention of Harris, 98 Wash.2d 276, 284-85, 654 P.2d 109 (1982) first recognized due process requires proof of a recent overt act to determine the current dangerousness of one who is subject to involuntary civil commitment. In re Det. of Albrecht, 147 Wash.2d 1, 8 n. 9, 51 P.3d 73 (2002). "[I]nvoluntary commitment requires a showing that the potential for doing harm is `great enough to justify such a massive curtailment of liberty.'" Harris, 98 Wash.2d at 283, 654 P.2d 109 (quoting Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972)). For constitutional due process purposes, we defined a recent overt act as an act "which has caused harm or creates a reasonable apprehension of dangerousness." Id. at 285, 654 P.2d 109.
¶ 35 The purpose behind the recent overt act requirement is to add objectivity to an otherwise subjective determination of mental illness and dangerousness. See Harris, 98 Wash.2d at 284, 654 P.2d 109; see also Christopher Slobogin, Dangerousness and Expertise Redux, 56 EMORY L.J. 275, 318 (2006) ("The strong consensus of the risk literature is that the number and type of prior violent acts committed by an individual are the factors most germane to a prediction of future behavior.").
¶ 36 In re Detention of Young, 122 Wash.2d 1, 857 P.2d 989 (1993) applied the recent overt act requirement established in Harris to sexually violent predator proceedings; "the State must provide evidence of a recent overt act in accord with Harris[[9]] whenever an individual is not incarcerated at the time the petition is filed." Young, 122 Wash.2d at 41, 857 P.2d 989.
¶ 37 After Young the legislature amended chapter 71.09 RCW to define a recent overt act as "any act that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm," tracking the language in Harris. Laws of 1995, ch. 216, § 1(5).
¶ 38 However, in 2001 the legislature redefined a recent overt act as "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." Laws of 2001, ch. 286, § 4(5) (emphasis added), former RCW 71.09.020(10) (2006). If possible, this legislative addition to our due process requirement should be construed as consistent with the constitutional justification for civil confinement. See Young, 122 Wash.2d at 41, 857 P.2d 989.
*1001 ¶ 39 The constitutional justification for civil confinement is current dangerousness caused by a mental defect plus a recent overt act, which "satisfies the dangerousness element required by due process." Albrecht, 147 Wash.2d at 11, 51 P.3d 73; see also Kansas v. Hendricks, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). It must be determined whether Anderson's conduct was both recent and dangerous.

A. Anderson's conduct was not recent
¶ 40 "[E]vidence [of an overt act] must be recent to be meaningful." Harris, 98 Wash.2d at 284, 654 P.2d 109. "The dangerousness must be current." Albrecht, 147 Wash.2d at 7, 51 P.3d 73. "[T]he recency of the acts upon which the State bases its commitment petition may be a significant factor in determining whether the individual is presently dangerous as required by both the statute and due process." In re Det. of Henrickson, 140 Wash.2d 686, 697, 2 P.3d 473 (2000).
¶ 41 Former RCW 71.09.020(10) does not define "recent," but the dictionary definition is "of or belonging to the present period or the very near past." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1894 (1993). "[C]urrent" is defined as "occurring in or belonging to the present time: in evidence or in operation at the time actually elapsing." Id. at 557.
¶ 42 Anderson's homosexual relationship with Darryl ended in 1991, and his relationship with Curtis and Bobby ended around 1996, years before the State filed its petition on February 25, 2000.[10] Therefore, even presuming Darryl, Bobby, and Curtis lacked the capacity to meaningfully consent, a presumption without support under Washington law,[11] Anderson's relationships with these men do not prove he is currently dangerous because these relationships ended years before the State filed its petition.
¶ 43 Moreover, these prior relationships lack relevancy to Anderson's current dangerousness because the trial court found Anderson is currently able to control his sexual arousal. In order to be subjected to civil commitment "there must be proof of serious difficulty in controlling behavior." Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).
¶ 44 Anderson's ability to control his behavior is not only relevant, it is dispositive; current dangerousness is the foundation of sexually violent predator commitment. See In re Det. of Henrickson, 140 Wash.2d 686, 692, 2 P.3d 473 (2000) ("The Washington sexually violent predator statute is premised on a finding of the present dangerousness of those subject to commitment."); Foucha v. Louisiana, 504 U.S. 71, 78, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (requiring the dual predicates of current mental illness and current dangerousness).
¶ 45 Even assuming these long-past relationships were somehow involuntary, they do not establish Anderson's current dangerousness. Nor can Anderson's current dangerousness be established under the analysis of In re Detention of Pugh, 68 Wash.App. 687, 845 P.2d 1034 (1993).[12]
¶ 46 In Pugh the Court of Appeals stated, "in considering whether an overt act, evidencing dangerousness, satisfies the recentness requirement, it is appropriate to consider the time span in the context of all the surrounding relevant circumstances." Id. at 695, 845 P.2d 1034. The critical circumstance in Pugh was Pugh's incarceration for the five-year period prior to the State's seeking involuntary commitment. Id. at 689, 845 P.2d 1034. "The absence of more recent overt acts during confinement is readily explainable *1002 as a lack of opportunity to offend rather than a demonstration of improvement so as to negate the showing that he presents a substantial risk of physical harm." Id. at 696, 845 P.2d 1034. However, Pugh recognized the "absence of overt acts in the last 5 years might be sufficient to discount the diagnosis and prediction of dangerousness were Pugh then living in the typical community." Id.
¶ 47 Anderson may not have been living in the "typical community" envisioned by the court in Pugh; however, Anderson was also not meaningfully "isolated from children toward whom he has a predilection to cause harm" because he regularly left the grounds of WSH up to four times a month. Id. If Anderson were truly unable to suppress his sexual urges toward children, some act or attempt would have manifested itself during all those years Anderson had access to the community.
¶ 48 The Pugh analysis is inapplicable to resolving the recentness element of our overt act requirement. Anderson's relationship with Rory remains as the barometer of Anderson's current dangerousness.
¶ 49 Anderson ended his relationship with Rory in late 1999. The State filed its petition on February 25, 2000. At least two months elapsed between Anderson's ending his relationship with Rory and the State's filing its petition. This delay renders Anderson's relationship with Rory too remote to be a meaningful barometer of Anderson's current dangerousness.[13]
¶ 50 The majority argues that Marshall, 156 Wash.2d 150, 125 P.3d 111, and Henrickson, 140 Wash.2d 686, 2 P.3d 473, stand for the proposition that two months is sufficiently recent because in Marshall and Henrickson the overt act in question occurred years before the State filed its petition. Majority at 997. These cases are distinguishable because Anderson was not incarcerated at the time the State filed its petition.
¶ 51 In Marshall and Henrickson the individuals subject to commitment were incarcerated at the time the State filed its petition, making it "impossible" for the State to prove a recent overt act. Young, 122 Wash.2d at 41, 857 P.2d 989; see also Marshall, 156 Wash.2d at 154, 125 P.3d 111; Henrickson, 140 Wash.2d at 689, 2 P.3d 473. "[W]here the State lacks an opportunity to prove present dangerousness with evidence of a recent overt act, the statute and our case law relieve the State of pleading and proving a recent overt act." In re Det. of Lewis, 163 Wash.2d 188, 194, 177 P.3d 708 (2008) (citing Young, 122 Wash.2d at 41, 857 P.2d 989). Correlatively, however, where the State has the opportunity to prove present dangerousness with evidence of a recent overt act, due process requires it to do so. Young, 122 Wash.2d at 41, 857 P.2d 989. In other words, due process does not require the "impossible," but it does require the possible. Id. As Anderson was not incarcerated at the time the State filed its petition, it was possible for the State to show Anderson committed a recent overt act.
¶ 52 Nevertheless, even assuming two months is sufficiently recent to be meaningful, Anderson's consensual homosexual relationship with Rory, an adult of average intelligence, does not evince Anderson is currently dangerous.

B. Anderson's conduct was not an overt act
¶ 53 To reiterate, the legislative definition of a recent overt act is "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." Former RCW 71.09.020(10). The State does not argue Anderson's conduct caused sexually violent harm. Instead, the State argues Anderson's conduct causes a reasonable apprehension of sexually violent harm.
¶ 54 The statute does not define "reasonable apprehension." Anderson argues we should incorporate the common law definition *1003 of "reasonable apprehension." See State v. Wilson, 125 Wash.2d 212, 217-18, 883 P.2d 320 (1994) (recognizing Washington courts may look to the common law to define undefined statutory terms).[14] This argument overlooks the origin of the recent overt act requirement in the rationale of Harris. As such, Harris and its progeny provide a better starting point for analyzing "reasonable apprehension" in the sexually violent predator context.
¶ 55 In Harris we stated, "[t]he risk of danger must be substantial and the harm must be serious before detention is justified." 98 Wash.2d at 284, 654 P.2d 109. For example in In re Detention of Meistrell, 47 Wash. App. 100, 103, 107, 733 P.2d 1004 (1987), the Court of Appeals affirmed the trial court's finding of a recent overt act involving the subject of the petition repeatedly placing his two young children in actual physical danger. Similarly, in In re Detention of A.S., 91 Wash.App. 146, 955 P.2d 836, aff'd, 138 Wash.2d 898, 982 P.2d 1156 (1999), the Court of Appeals affirmed the trial court's finding of a recent overt act involving repeated threats of suicide coupled with the respondent's making sawing motions against her wrist with a comb three days after an attempted suicide. Id. at 152, 955 P.2d 836.
¶ 56 These cases suggest an overt act requires an actual or obvious risk of substantial physical harm to self or others. See Harris, 98 Wash.2d at 284-85, 654 P.2d 109; see also Christopher Slobogin, A Jurisprudence of Dangerousness, 98 Nw. U.L.REV. 1, 21 (2003) ("Unless the individual engages in conduct that causes legally-defined harm or that is otherwise obviously risky, the government should not be permitted to intervene preventively.").
¶ 57 An actual or obvious risk of substantial physical harm, however, is only part of the equation. The legislature added an element not found in Harris, and this element should be construed constitutionally, if possible.
¶ 58 To satisfy due process the legislature's addition to the recent overt act requirement demands a causal relationship between the person's diagnosed mental or personality disorder and his conduct. This relationship reflects "the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment `from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.'" Crane, 534 U.S. at 412, 122 S.Ct. 867 (quoting Kansas, 521 U.S. at 360, 117 S.Ct. 2072) "That distinction is necessary lest `civil commitment' become a `mechanism for retribution or general deterrence'  functions properly those of criminal law, not civil commitment." Id. (quoting Hendricks, 521 U.S. at 372-73, 117 S.Ct. 2072 (Kennedy, J., concurring)); see also Eric S. Janus, Preventing Sexual Violence: Setting Principled Constitutional Boundaries on Sex Offender Commitments, 72 IND. L.J. 157 (1996) (discussing the rejection of prevention as the sole justification for civil commitment).
¶ 59 The statute requires this causal connection in its definition of a sexually violent predator as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." Former RCW 71.09.020(16) (2006) (emphasis added); see also RCW 71.09.010 (stating "sexually violent predators generally have personality disorders and/or mental abnormalities which are unamenable to existing mental illness treatment modalities and those conditions render them likely to engage in sexually violent behavior." (emphasis added)).
¶ 60 Moreover, this causal connection gives purpose and meaning to the definition of a recent overt act, which requires knowledge of the person's history and mental disorder. Former RCW 71.09.020(10). This establishes the rational basis for the apprehension of sexually violent harm, separating the everyday activities of life from activities that *1004 justify civil commitment. Harris, 98 Wash.2d at 283, 654 P.2d 109.
¶ 61 Otherwise, a person risks civil commitment once convicted of a sexually violent offense and diagnosed with a mental illness regardless of any causal relationship between the mental condition and the conduct in question. Persons could be subject to commitment based solely on their status as a prior sexual offender and fear of mental illness. See Harris, 98 Wash.2d at 281, 654 P.2d 109 (stating "[t]he laws of involuntary civil commitment should not reflect the[] irrational fears of mental illness").
¶ 62 Civil commitment for sex predators would then no longer "focus[] on treating petitioners for a current mental abnormality, and protecting society from the sexually violent acts associated with that abnormality." Young, 122 Wash.2d at 21, 857 P.2d 989 (emphasis added); see also Eric S. Janus & Wayne A. Logan, Substantive Due Process and the Involuntary Confinement of Sexually Violent Predators, 35 CONN. L.REV. 319 (2003) (positing a substantive due process right to treatment).
¶ 63 Here we must examine the relationship, if any, between the conduct the State alleges to be a recent overt act and Anderson's diagnosed pedophilia and sexual sadism. Compare Albrecht, 147 Wash.2d 1, 51 P.3d 73 (alleged sexually violent predator with a history of child sexual assault and diagnosed with pedophilia violating community release conditions) with Marshall, 156 Wash.2d at 159, 125 P.3d 111 (alleged sexually violent predator with a history of child molestation and diagnosed with pedophilia raping a developmentally disabled woman); In re Det. of Froats, 134 Wash.App. 420, 140 P.3d 622 (2006) (alleged sexually violent predator with a history of child-kidnapping and molestation and diagnosed with pedophilia sexually harassing a developmentally delayed fellow inmate and displaying hundreds of pictures of children); In re Det. of Hovinga, 132 Wash.App. 16, 130 P.3d 830 (2006) (alleged sexually violent predator with a history of raping young girls and masturbating while covertly following girls around a store); In re Det. of Robinson, 135 Wash.App. 772, 146 P.3d 451 (2006) (alleged sexually violent predator with a history of child rape in a locked room with a child), review denied, 161 Wash.2d 1028, 172 P.3d 360 (2007); In re Det. of Broten, 130 Wash.App. 326, 122 P.3d 942 (2005) (alleged sexually violent predator with a history of child molestation and a diagnosis of pedophilia being unsupervised at a playground); In re Det. of Albrecht, 129 Wash.App. 243, 252, 118 P.3d 909 (2005) (alleged sexually violent predator with a history of child sexual assault and diagnosed with pedophilia luring a young boy).
¶ 64 As succinctly stated by Judge Armstrong, "in every case where we found sufficient evidence of a recent overt act, the act was a continuation of the sex offender's pathological behavior." Anderson, 134 Wash.App. at 327-28, 139 P.3d 396 (Armstrong, J., dissenting).
¶ 65 Thus, a recent overt act is an act presenting an actual or obvious danger of substantial physical harm or a threat of an actual or obvious danger of substantial physical harm caused by the individual's diagnosed mental or personality disorder.
¶ 66 The majority asserts that Anderson committed a recent overt act by engaging in consensual homosexual conduct.[15]
¶ 67 Anderson's history of sexual offense involves the rape of a child. He was convicted of raping a two-and-a-half-year-old boy. He has admitted to raping other boys as a juvenile. He is a diagnosed pedophile and sexual sadist.
¶ 68 Over the course of 10 years, Anderson engaged in consensual homosexual relationships with four adult males, yet only one relationship is arguably recent to be a useful barometer of Anderson's current dangerousness. This conduct does not result from Anderson's diagnosed pedophilia or sexual sadism. A consensual homosexual relationship with an adult male of average intelligence is inconsistent with a diagnosis of pedophilia. The record does not indicate any sexual violence or otherwise forceful conduct *1005 consistent with Anderson's diagnosed sexual sadism.
¶ 69 Dr. Amy Phenix, the State's expert witness, testified Anderson's conduct was a form of victim substitution. However, whether Anderson's consensual sexual activity with an adult is a substitution for his victimization of children is irrelevant to the issue of whether Anderson's conduct satisfies the due process requirement of a recent overt act. As a mixed question of law and fact the underlying facts are found by the fact finder with the court applying legal principles to those facts. Erwin, 161 Wash.2d at 687, 167 P.3d 1112. Here, Anderson concedes the underlying facts. "Victim substitution" may be an interesting psychiatric label, but it is not dispositive of the legal issue before this court. Whether Anderson's conduct constitutes a recent overt act is a determination the court must make as a matter of law.
¶ 70 Anderson's consensual homosexual sex is distinguishable from the conduct in Marshall, 156 Wash.2d 150, 125 P.3d 111, and Froats, 134 Wash.App. 420, 140 P.3d 622, two similar cases where the court observed a recent overt act. In Marshall, this court found a recent overt act in the rape of a developmentally disabled woman. "In light of Marshall's history [prior convictions of child molestation] and mental condition [pedophilia], the third degree rape, which involved nonconsensual sex with a developmentally disabled woman who functioned at the level of a 10- or 12-year-old, would create a reasonable apprehension of harm...." Marshall, 156 Wash.2d at 159, 125 P.3d 111 (emphasis added).
¶ 71 In Froats, petitioner made unwanted advances to a fellow resident of a work release facility not fitting Froats' victim profile. The State's expert testified the conduct was a form of symptom substitution in which Froats acted out his pedophilic urges on an adult in the absence of a preferred victim. 134 Wash.App. at 437, 140 P.3d 622.
¶ 72 But here there are no allegations of rape or unwanted advances. Moreover, Anderson was never meaningfully sequestered away from his allegedly preferred victims. Anderson was able to leave WSH, which he did frequently. In sum, there is no relation between Anderson's consensual homosexual relationship, history, and his mental diagnosis.
¶ 73 Significantly, the State filed its petition not in response to Anderson's sexual activities at WSH, but in response to Anderson's expressing his desire to leave WSH. The State never sought to commit Anderson during his residence at WSH, during which time Anderson openly engaged in the sexual behavior the State now calls evidence of Anderson's dangerousness. The relevant act, therefore, is not the conduct the State pardoned for years, but Anderson's expressing his desire to leave WSH, an act insufficient to show current dangerousness.

C. Dismissal is proper remedy
¶ 74 The Court of Appeals stated the remedy for insufficient evidence was remand not dismissal because "double jeopardy does not preclude retrial in the civil context...." Anderson, 134 Wash.App. at 324, 139 P.3d 396. This is partly correct.
¶ 75 The Court of Appeals correctly noted under our existing precedent double jeopardy does not apply to sexually violent predator petitions because those petitions are "civil rather than criminal." Young, 122 Wash.2d at 59, 857 P.2d 989. However, as properly observed by Judge Armstrong, "if we hold that the State failed to prove a recent overt act, res judicata or law of the case would prevent the State from again litigating the issue on the same evidence." Anderson 134 Wash.App. at 328, 139 P.3d 396 (Armstrong, J., dissenting); see also Hayes v. City of Seattle, 131 Wash.2d 706, 712-13, 934 P.2d 1179, 943 P.2d 265 (1997) (providing a multipart analysis to determine if a subsequent suit would be permitted). Since the State failed to prove a recent overt act, the State should be precluded from again seeking to prove so using the same evidence. The appropriate remedy is dismissal.
¶ 76 Therefore, I dissent.
¶ FAIRHURST, J. (concurring in dissent).
¶ 77 I find I cannot join either the majority or the dissent. I cannot join the majority's *1006 holding that John Charles Anderson's consensual relationships with four adult men constitute recent overt acts.[1] The majority misstates the record, and the conduct at issue is not sufficiently related to Anderson's diagnosis and pattern of nonconsensual, abusive relationships with children, and inappropriate behavior toward women. I cannot join the dissent because it unnecessarily posits a new definition of a recent overt act[2] and implies the statutory definition is unconstitutional.[3] Because of the flaws in both opinions, I write separately to explain why application of our statutes and case law demonstrates the State failed to prove Anderson committed a recent overt act.
¶ 78 Former RCW 71.09.020(10) establishes that a "`[r]ecent overt act'" is "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person." The State's expert, Dr. Amy Phenix, testified that Anderson's relationships with four adult male patients at Western State Hospital (WSH) qualified as recent overt acts. Based on her assessment, the trial court found that Anderson's "conduct with respect to these patients" constituted a recent overt act. Clerk's Papers (CP) at 188. Although Anderson's partners are characterized as "vulnerable," CP at 187, neither the State nor Anderson's partners claimed that any actual harm of a sexually violent nature resulted from these relationships. Dr. Larry Arnholt, who described Anderson's WSH partners at trial, testified that "he was unaware of any coercive or forceful aspects to any of these sexual relationships." CP at 181. Contrary to the majority's assertion, there is no testimony that any of the partners had developmental or psychiatric disabilities that rendered them legally incapable of consenting. Majority at 995-96.[4] We must determine whether there is sufficient evidence that Anderson committed a recent overt act under former RCW 71.09.020(10), which in this case means whether the State proved beyond a reasonable doubt that Anderson's consensual sexual relationships with these four vulnerable adults created a reasonable apprehension of sexually violent harm in the mind of an objective person who knows Anderson's history and mental condition.[5]
¶ 79 Whether an individual's actions constitute a recent overt act is a mixed question of *1007 law and fact. In re Det. of Marshall, 156 Wash.2d 150, 158, 125 P.3d 111 (2005). I disagree with the majority's application of the law to the facts. In Marshall, this court adopted a two-step analysis for determining whether an act qualifies as a recent overt act for the purposes of a sexually violent predator petition.
[F]irst, an inquiry must be made into the factual circumstances of the individual's history and mental condition; second, a legal inquiry must be made as to whether an objective person knowing the factual circumstances of the individual's history and mental condition would have a reasonable apprehension that the individual's act would cause harm of a sexually violent nature.
Id.
¶ 80 Under Marshall, we first look to the factual circumstances of Anderson's history and mental condition. Dr. Phenix diagnosed Anderson with sexual sadism, pedophilia, and a personality disorder with antisocial, borderline, and narcissistic traits. His past offenses include anally raping a two-and-a-half-year-old boy (1988), assaulting his roommate (1988), and exposing himself to a female adult staff member (1989). During therapy sessions at WSH, Anderson admitted to sexual fantasies involving women, fantasies about sexual molestation of young boys and girls, and two other rapes of children.[6] The State also submitted evidence about Anderson's breaking WSH rules regarding alcohol consumption and leaving the hospital grounds without permission. For purposes of the factual inquiry, Anderson has a pattern of nonconsensual, abusive sexual relations with children and inappropriate sexual behavior toward women.
¶ 81 The second part of the Marshall test is the legal inquiry. The test requires a reasonable connection between the claimed recent overt act and the individual's history and mental condition in the view of an objective person.[7] Former RCW 71.09.020(10). The alleged recent overt acts include Anderson's sexual relationships with four adult male patients at WSH: Darryl, who is mildly to moderately retarded; Bobby, who is mildly retarded; Curtis, who is mildly retarded; and Rory, who has low average intelligence and borderline personality disorder. Although the majority chooses to analyze Anderson's fantasies as alleged overt acts, they are more appropriately addressed as evidence of his mental condition and history. Because no evidence was presented to show that Anderson's rule breaking behavior correlates to his diagnosis, these actions bear no reasonable relation to an apprehension of sexually violent harm.[8]
¶ 82 Thus, the alleged recent overt acts at issue are Anderson's consensual sexual relationships with fellow adult male patients. None of Anderson's partners filed any complaints against him, although WSH staff urged all parties to end the relationships. Dr. Phenix characterized the relationships as exploitive but did not describe them as abusive. Again, no witness testified that the relationships were nonconsensual. The question is whether these relationships create a reasonable apprehension of sexually violent harm, given Anderson's diagnosis and pattern of nonconsensual, abusive sexual relations with children and inappropriate behavior toward women.
¶ 83 Anderson's consensual relationships with the four adult male patients at WSH do not produce a reasonable apprehension of *1008 sexual violence given his history and diagnosis.[9] Although Dr. Phenix said that Anderson's relationships were akin to his past assaults on children, neither she nor Dr. Arnholt characterized Anderson's partners as having the developmental ages of children.[10] Nor did anyone claim the relationships were nonconsensual or abusive. The relationships were with men and do not have any reasonable relation to Anderson's history of inappropriate behavior toward women. Because Anderson's consensual relationships with adults did not cause sexually violent harm and do not create a reasonable apprehension of sexually violent harm in light of his history and mental condition, the Court of Appeals' finding that he is a sexually violent predator should be reversed. I dissent.
WE CONCUR: CHAMBERS and STEPHENS, JJ.
NOTES
[1] The Sexually Violent Predator Act defines SVP as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." Former RCW 71.09.020(16).
[2] Anderson claims these relationships were consensual but that claim ignores the fact that most people adjudicated to be mentally ill are legally unable to consent. See RCW 9A.44.050(1)(b) and RCW 9A.44.100(1)(b) (punishing defendants who have sex with people incapable of consenting because of mental incapacity); see also State v. Ortega-Martinez, 124 Wash.2d 702, 711, 881 P.2d 231 (1994) ("[A] superficial understanding of the act of sexual intercourse does not by itself render [the mental incapacity law] inapplicable." A victim with mental incapacity fails to consent "where the jury finds the victim had a condition which prevented him or her from meaningfully understanding the nature or consequences of sexual intercourse.").
[3] Sexual relationships between patients are against WSH rules but are not uncommon. WSH makes condoms available.
[4] Because Anderson waived his right to a jury, the trial judge sat as the finder of fact.
[5] A recent overt act is "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." Former RCW 71.09.020(10). Although the State is not required to prove a recent overt act in every SVP commitment proceeding, it conceded that it had to in this case. Anderson, 134 Wash.App. at 323, 139 P.3d 396.
[6] This court has previously decided that sex with a developmentally disabled person may have a nexus to child sex. In Marshall, 156 Wash.2d 150, 125 P.3d 111, we upheld a recent overt act finding where a man had been previously convicted of child molestation and his later overt act was the rape of an adult handicapped woman.
[7] The court did appoint Dr. Wollert to advise Anderson. However, as the Court of Appeals observed, this did not allow the trier of fact (the trial court itself in this case) to hear and consider testimony rebutting the State's evidence of Anderson's future dangerousness, a key element of the case.
[8] See former RCW 71.09.040 (2001) (judicial finding of probable cause, right to legal representation at the probable cause hearing, and evaluation only by a qualified professional); former RCW 71.09.050 (1995) (right to speedy trial, right to assistance of counsel at all stages of the proceeding, right to retain experts, and right to jury trial); former RCW 71.09.060 (2008) (proof must be beyond a reasonable doubt).
[1] Initially Anderson was admitted involuntarily for a 72-hour evaluation under chapter 71.05 RCW. Afterward he remained voluntarily.
[2] The record indicates Anderson engaged in heterosexual relationships as well. However, the State does not argue these relationships were recent overt acts.
[3] There are four categories of mental retardation: mildly retarded, moderately retarded, severely retarded, and profoundly retarded. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 37-45 (4th ed.1994).
[4] In a sexual history summary Anderson provided to his sex offender treatment provider, Anderson characterized his sexual history as "deviant" and "nondeviant" without specific or readily identifiable reason. Report of Proceedings (RP) at 120-22 (testimony of Maureen Saylor).
[5] The record indicates on May 16, 1999, Anderson was recommended for civil commitment as a sexually violent predator. Clerk's Papers (CP) at 36. It is unknown why the State waited approximately 10 months to file its petition.
[6] violent predator" means any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.
Former RCW 71.09.020(16) (2006).
"Likely to engage in predatory acts of sexual violence if not confined in a secure facility" means that the person more probably than not will engage in such acts if released unconditionally from detention on the sexually violent predator petition. Such likelihood must be evidenced by a recent overt act of the person is not totally confined at the time the petition is filed. . . .
Former RCW 71.09.020(7) (2006).
[7] This analysis does not defeat the purpose of the fact finder; appellate courts frequently analyze the legal sufficiency of evidence. See, e.g., Bunch v. Dep't of Youth Servs., 155 Wash.2d 165, 179, 116 P.3d 381 (2005).
[8] See State v. Ortega-Martinez, 124 Wash.2d 702, 711, 881 P.2d 231 (1994) (holding the State must prove the "victim had a condition which prevented him or her from meaningfully understanding the nature or consequences of sexual intercourse"); In re Det. of LaBelle, 107 Wash.2d 196, 204-05, 728 P.2d 138 (1986) (stating mental illness does not automatically render a person unable "to provide for . . . essential human needs"); see also Elizabeth J. Reed, Note, Criminal Law and the Capacity of Mentally Retarded Persons To Consent to Sexual Activity, 83 VA. L.REV. 799, 805 (1997) ("[E]xperts in the field of mental retardation generally agree that mentally retarded persons have a fundamental right to sexual expression."). Simply put, "an individual will not be considered presumptively incompetent, for any or all purposes, simply because she is institutionalized." Michael L. Perlin, Hospitalized Patients and the Right to Sexual Interaction: Beyond the Last Frontier?, 20 N.Y.U. REV. L. & SOC. CHANGE 517, 528-29 (1992-94).
[9] 98 Wash.2d 276, 654 P.2d 109.
[10] The trial court's findings of fact do not specify actual dates; however, the uncontroverted testimony indicates Anderson's relationship with Darryl ended in 1991, his relationships with Bobby and Curtis ended around 1995 or 1996. CP at 185-86; RP at 162, 168-69.
[11] See supra note 8.
[12] To find a recent overt act, the trial court relied primarily on Pugh, 68 Wash.App. 687, 845 P.2d 1034. The relevancy of the Pugh analysis in a sexually violent predator context is debatable. First, Pugh involved involuntary commitment pursuant to chapter 71.05 RCW. Second, Pugh was published six months prior to Young, 122 Wash.2d 1, 857 P.2d 989, yet Young never cites Pugh, and a majority of this court has never cited Pugh in any subsequent recent overt act analysis.
[13] For example, in Harris we held a five-day delay too remote to be meaningful. Harris, 98 Wash.2d at 284, 654 P.2d 109.
[14] The common law defines a reasonable apprehension of harm as intentional conduct creating the perception of an imminent physical harm accompanied by an apparent ability to carry out the harm. Howell v. Winters, 58 Wash. 436, 438, 108 P. 1077 (1910).
[15] It does not contend disclosing sexual fantasies or breaking the rules at WSH can be considered recent overt acts. Therefore I need not discuss why they are not.
[1] The definition of "`[r]ecent overt act'" in former RCW 71.09.020(10) (2006), recodified as RCW 71.09.020(12) defines the act or threat. Because I find the alleged acts fail to meet the definition, there is no need to address whether or not Anderson's actions were recent.
[2] "Thus, a recent overt act is an act presenting an actual or obvious danger of substantial physical harm or a threat of an actual or obvious danger of substantial physical harm caused by the individual's diagnosed mental or personality disorder." Dissent at 1004.
[3] "To satisfy due process the legislature's addition to the recent overt act requirement demands a causal relationship between the person's diagnosed mental or personality disorder and his conduct." Dissent at 1003. Justice Sanders presented this same theory in his concurrence in In re Detention of Lewis, 163 Wash.2d 188, 177 P.3d 708 (2008).
[4] The evidence closest to the premise that a partner was incapable of consenting occurred when Dr. Arnholt testified:

Well, the indication was that [Darryl] was developmentally disabled, certainly not a consensual equal partner. That's something that we focused on the group, that a person should be functioning on the same level, that they should be competent to make a decision, and that a relationship, an equal relationship should clearly be established, because the context of the group indicates that any sexual offense uses somebody or something as an object, and it was certainly not considered acceptable. So we focused on the quality of the relationship for sexual contact to be something that would be positive.
1 Verbatim Report of Proceedings (VRP) at 74-75. Prior to that testimony, the assistant attorney general explicitly told the trial court she would not elicit testimony from Dr. Arnholt regarding whether the relationships were consensual or not. 1 VRP at 72. Testifying that the partner was functioning at a different level than Anderson, with nothing more, is not the same as testifying the partner was incapable of consent.
[5] There is no need to analyze whether Anderson meets the definition of a "`[s]exually violent predator,'" former RCW 71.09.020(16) (2006), recodified as RCW 71.09.020(18), as the dissent does, dissent at 1003-04, or ponder why the State decided to file its petition when it did, dissent at 1005.
[6] Anderson said that when he was 13, he sexually molested an 11-year-old boy. When he was 15, he anally raped a 13-year-old boy. Anderson was not charged or convicted for either incident.
[7] While the alleged recent overt acts and Anderson's mental condition and history must be reasonably related, there is no statutory requirement for a causal nexus. See In re Det. of Froats, 134 Wash.App. 420, 140 P.3d 622 (2006) (holding Froats' unwanted touching of an inmate who had developmental age of five and his possession of hundreds of photos of children constituted recent overt act), review denied, 160 Wash.2d 1022, 163 P.3d 795 (2007); State v. McNutt, 124 Wash.App. 344, 351, 101 P.3d 422 (2004) ("Although the act of communicating here involved a girl rather than boys, we conclude that it constitutes a recent overt act.").
[8] Compare with In re Detention of Broten, 130 Wash.App. 326, 122 P.3d 942 (2005), where Broten's violation of his release conditions by going to a children's playground is reasonably related to his mental condition and history.
[9] Aside from its blanket statement that Anderson's exploiting vulnerable adults was closely akin to his assaults on children, the majority provides no further analysis to explain the connection. Majority at 997. As a result, it does not account for the fact, unlike Anderson's child victims, that there is no evidence demonstrating any of the partners could not consent to the relationship. Further, because of the limited discussion on the partners' developmental and psychiatric disabilities, it appears that, according to the majority, Anderson's partners could have had any form of developmental or psychiatric disability, however slight, and it would constitute a recent overt act.
[10] While Dr. Arnholt describes the partners in a range from mildly to moderately retarded, there is no reference as to their developmental ages. Compare with Marshall, 156 Wash.2d at 159, 125 P.3d 111 (Marshall's nonconsensual sex with a developmentally disabled woman who had a developmental age of 10 to 12 constituted an overt act); Froats, 134 Wash.App. at 427, 140 P.3d 622 (Froats' unwanted sexual advances toward a fellow inmate who had a developmental age of 5 was an overt act).